**NOT RECOMMENDED FOR PUBLICATION**
File Name: 18a0603n.06

No. 18-3330

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 30, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| BRYAN K. BAYES, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellee. | ) | |
| | ) | |

**BEFORE: SILER, SUTTON, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.**

Bryan Bayes appeals the district court's order affirming the denial of his application for social security disability benefits. Because the Administrative Law Judge's (ALJ) determination was supported by substantial evidence, we AFFIRM the judgment of the district court.

## I. BACKGROUND

Bayes sought Social Security benefits based on physical impairments related to his neck, back, and pulmonary problems, and mental-health impairments related to depression and anxiety. Because his sole claim on appeal relates to the ALJ's consideration of evidence relating to his mental-health impairments, we focus on this aspect of the record.

Bryan Bayes was born in 1964. After finishing twelfth grade, he worked as an auto-body worker and an insurance adjuster. In May 2010, Bayes injured his neck and back[1] in a car accident while at work. He last worked in June 2010. On July 18, 2012, Bayes filed an application for disability insurance benefits, alleging a disability-onset date of June 16, 2010. The SSA initially denied Bayes's application and denied it again on reconsideration. Bayes then requested an administrative hearing and one was held before an ALJ on July 17, 2014.

## A. Treatment

Bayes presented evidence that after the accident he went to William Hogan, M.D., and chiropractor Doug Hosey with complaints of back pain. On June 16, 2010, St. Rita's Medical Center admitted Bayes for chronic pain and suicidal threats after Bayes claimed that he "did not want to continue living under such circumstances." (R. 11, PID 346.) Upon admission to St. Rita's, Bayes stated that he was experiencing marital difficulties, but was "no longer suicidal." (*Id.* at PID 347.) Bayes was diagnosed with "major depressive disorder, single episode, moderate," along with physical impairments related to his neck and back. (*Id.* at PID 346.) St. Rita's discharged Bayes on June 21, 2010. Bayes began taking Zanaflex, Prozac, OxyContin, and Percocet, and Dr. Stephen Katz at St. Rita's noted that the adjustment in medications helped Bayes's pain considerably.

Between July 2010 and August 2012, Bayes presented at the Forest Community Health Center on numerous occasions and was diagnosed with depression and anxiety.

In October 2012, clinical psychologist Michael Wuebker evaluated Bayes in connection with his application for social security disability benefits. Bayes reported mental-health issues

---

[1] Bayes already had a history of back problems, including lumbar spondylosis. During an examination on September 1, 2009, Bayes reported that his back pain "began many years ago with a gradual onset and no obvious inciting event or injury." (R. 11, PID 307.)

including depression, avoidance of people, suicidal ideation, and panic episodes. Dr. Wuebker diagnosed dysthymic disorder, panic disorder without agoraphobia, and personality disorder. Dr. Wuebker found that Bayes had an average range of intellectual functioning and his mental-health issues would have "some affect" on his ability to maintain concentration, persistence, or pace. (*Id.* at PID 460.) Dr. Wuebker opined that Bayes did not show any behavior suggesting that he would have difficulty getting along with co-workers or supervisors, but would have some difficulty dealing with work-related pressures. That same month, Bayes saw neurosurgeon Sean Logan, M.D., for lower back and dorsal neck pain. Dr. Logan recommended Bayes undergo a psychological evaluation, but Bayes did not seek one.

In January 2013, Bayes was seen by his general practitioner, Mark Fenzl, D.O., for a checkup for hyperlipidemia. Dr. Fenzl noted that Bayes presented as depressed, had discontinued taking his medication, and had not scheduled an appointment to see a psychiatrist. In February 2013, physician assistant Matthew Nienberg, who worked in Dr. Hogan's office, saw Bayes for a follow-up for his neck pain and noted that Bayes was experiencing depression and anxiety resulting from the car accident.

In February 2013, clinical psychologist Alan White conducted an evaluation in connection with Bayes's application for social security disability benefits. Bayes reported symptoms including fatigue, change in appetite, feelings of worthlessness and guilt, feelings of helplessness and hopelessness, a loss of interest in formerly pleasing activities, crying spells, isolation from others, irritability with others, forgetfulness, problems concentrating, trouble making day-to-day decisions, frustration, restlessness, and "spells" where he felt suddenly short of breath, dizzy, sweaty, and as if his heart was racing. (*Id.* at PID 533–34.) Dr. White diagnosed Bayes with bipolar disorder and panic disorder without agoraphobia. Dr. White concluded that Bayes could

function in a work setting but would have concentration limitations that would impair his ability to complete tasks, and that he might have trouble dealing with workplace pressures, which could aggravate his mental-health issues.

In April 2013, Bayes met with David Lewandowski, M.Ed., and Dr. Glenn Swimmer, a psychologist, following a referral from Dr. Hogan. Lewandowski and Dr. Swimmer reported Bayes was "experiencing a mood disorder which is the result of his industrial injury" and observed that he had been taking his Prozac inconsistently. (*Id.* at PID 611.) Lewandowski and Dr. Swimmer stated that they wanted to "get him evaluated to determine if this depressive disorder could be added to his Workers' Compensation claim" and proposed that they continue to meet with Bayes to try to decrease his symptoms. (*Id.*)

On April 17, 2013, Bayes met with Dr. Fenzl, who diagnosed recurrent major depressive disorder. Bayes saw Dr. Fenzl again a few weeks later, on May 9, 2013. Dr. Fenzl noted that medication improved Bayes's depression, but that his pain exacerbated it. Dr. Fenzl again diagnosed Bayes with major depressive disorder.

In July 2013, Bayes was admitted to the Northwest Ohio Psychiatric Hospital after an incident in his yard where he was screaming, holding a gun, and threatening to hurt himself. David Bellian, M.D., conducted a psychiatric examination. Bayes told Dr. Bellian that his family conflicts had worsened and that he continued to experience back pain. Bayes stated that he had not taken medication in a year and was having difficulty managing his pain. (*Id.*) Bayes explained that he felt depressed and considered suicide, but denied manic symptoms and expressed hope that his condition would improve. At the time, he was taking a "modest amount of Effexor 75 mg daily." (*Id.* at PID 723.) Dr. Bellian diagnosed Bayes with depressive disorder and doubled his Effexor dosage.

On July 23 and August 21, 2013, Bayes met with Dr. Fenzl, who diagnosed recurrent major depressive disorder on both occasions.

In September 2013, Bayes saw Jatinder Rana, M.D., for a psychiatric evaluation. Dr. Rana continued Bayes's Effexor and advised that he make an appointment with a therapist. Bayes returned to Dr. Rana the next month and reported that his medication adjustment was improving his sleep and helping his depression. He also complained of back, neck, and leg pain, as well as financial difficulties. Dr. Rana continued Bayes's medications.

On October 25, 2013, Bayes met with Dr. Swimmer for a psychological evaluation related to his Ohio workers' compensation claim. Dr. Swimmer diagnosed "Major Depressive Disorder, Recurrent, Moderate," that rendered Bayes totally and temporarily disabled, and anxiety disorder that rendered him totally and temporarily disabled pending treatment. (*Id.* at PID 808.) That same day, Dr. Swimmer completed an Ohio Bureau of Workers' Compensation (BWC) form entitled Physician's Report of Work Ability. The form asked Dr. Swimmer to list the "conditions being treated due to the work-related injury" and to indicate whether those conditions caused "temporary total disability." (*Id.* at PID 812.) Dr. Swimmer listed moderate major depressive disorder, recurrent, and anxiety disorder, and noted that those conditions caused temporary total disability. Dr. Swimmer checked boxes on the form indicating that Bayes was moderately impaired in his activities of daily living, social functioning, and concentration, persistence and pace, and markedly impaired in his ability to adapt to stressful circumstances. The form defined adaptation as the "ability to appropriately react to stressful circumstances, including the workplace; includes attendance, making decisions, scheduling or completing tasks and interacting with supervisors and co-workers." (*Id.* at PID 811.) Dr. Swimmer noted on the form that Bayes would not be a good

candidate for vocational rehabilitation services because of his need for "treatment to stabilize psychological symptoms." (*Id.* at PID 812.)

On December 11, 2013 Bayes saw Dr. Fenzl. Dr. Fenzl again diagnosed recurrent major depressive disorder.

On January 16, 2014 Bayes saw Dr. Rana. She noted the ongoing diagnosis of major depressive disorder. On exam Dr. Rana noted Bayes related poorly, had poor eye contact, and ruminated over "the same issues." (*Id.* at PID 830.)

On February 26, 2014, Dr. Swimmer completed a second Ohio BWC Physician's Report of Work Ability. Dr. Swimmer had not seen Bayes since the October visit; he listed the same diagnoses and stated that Bayes was temporarily totally disabled and could not work from January 25 to April 1, 2014. Dr. Swimmer noted that Bayes had not started treatment.

Three months later, on May 27, 2014, Dr. Swimmer filled out a BWC "mental impairment questionnaire" in which he listed several DSM-IV diagnoses and checked boxes indicating Bayes experienced "Anhedonia or pervasive loss of interest in almost all activities"; "Psychomotor agitation or retardation"; "Feelings of guilt or worthlessness"; "Thoughts of suicide"; "Sleep disturbance"; "Decreased energy"; "Difficulty concentrating or thinking"; and being "Easily distracted." (*Id.* at PID 845.) Under "Clinical Findings," Dr. Swimmer wrote "See Report." (*Id.*) Dr. Swimmer listed several medications prescribed by a psychiatrist, stated his prognosis was "guarded," and answered that he anticipated that Bayes would be absent from work more than four days per month. (*Id.*) In the "Mental Residual Functional Capacities" section of the form, Dr. Swimmer checked boxes indicating that Bayes had moderate[2] limitations in his ability to

---

[2] The questionnaire states: "A moderate impairment is one that does not prevent employment, but may interfere with effectiveness, efficiency, and productivity of employment up to one-third of the time on a reoccurring basis in an 8-hour workday." (R. 11, PID 846.)

"[m]aintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness" and "[i]nteract appropriately with the general public"; had marked[3] limitations in his ability to "[m]aintain attention and concentration for extended periods"; "[w]ork in coordination with or proximity to others without being distracted by them"; "[g]et along with coworkers or peers without exhibiting behavioral extremes"; "[s]ustain an ordinary routine without special supervision"; and "[u]nderstand, remember, and carry out very short and simple instructions"; and had extreme[4] limitations in his ability to "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms"; "[p]erform activities without a schedule, maintain regular attendance, and be punctual within customary tolerances"; "[a]ccept instruction and respond appropriately to criticism from supervisors"; "[p]erform at a consistent pace without an unreasonable number and length of rest periods"; "[r]espond appropriately to changes in a routine work setting"; and "[d]eal with normal work stress". (*Id.* at PID 846–47.) Dr. Swimmer further answered that Bayes had the following functional limitations as a result of his mental impairments: moderate "[r]estriction of activities of daily living"; marked "[d]ifficulties in maintaining concentration, persistence, or pace"; and extreme "[d]ifficulties in maintaining social functioning." (*Id.* at PID 847.) Dr. Swimmer listed "Cannot concentrate/Severe Depression Attempted Suicide" as "additional reasons not covered above why your patient would have difficulty working at a regular job on a sustained basis." (*Id.*)

---

[3] The questionnaire states: "A marked level of impairment is one that significantly impedes useful functioning and productivity in a work setting. A marked impairment is one where required work effectiveness, efficiency, and productivity is diminished at least fifty percent of the time on a consistent basis in an 8-hour workday." (R. 11, PID 846.)

[4] The questionnaire states: "An extreme limitation is one that is not compatible with effective, efficient, productive work activity. The negative manifestations of this limitation would be present and exhibited throughout an 8-hour workday." (R. 11, PID 846.)

On May 28, 2014, Bayes saw Dr. Fenzl. Dr. Fenzl noted Bayes's mental-health symptoms were uncontrolled with medication and indicated that Bayes "frequently becomes tearful without provocation and is easily agitated." (*Id.* at PID 835.) Dr. Fenzl also wrote that Bayes "would not be able to function in a position that requires interaction with others." (*Id.*) He noted Bayes had uncontrolled anxiety with panic attacks three to four times per week. Dr. Fenzl diagnosed recurrent major depressive disorder and generalized anxiety disorder.

### B. Bayes's testimony

During the ALJ hearing, Bayes testified primarily to his physical impairments, including chronic back and neck pain. Bayes also reported depression and anxiety. He explained that his mood is "up and down . . . One minute I can be alright. And it, just the next minute, I could just blow up" (*id.* at PID 81); his panic attacks cause him to want to be alone and his "heart starts racing" (*id.*); and he did not have many friends and got nervous around people he did not know (*id.* at PID 77). Bayes provided no further testimony regarding the effect his psychological issues had on his ability to work.

### C. Vocational expert

The ALJ asked Vocational Expert Dr. Astrike to determine whether a hypothetical individual of Bayes's age, education, and work experience could perform Bayes's past work or any other work if that person had the following characteristics: can lift and carry 20 pounds occasionally and 10 pounds frequently; can stand and walk four hours out of an eight-hour workday; can sit for six hours in an eight-hour workday; can frequently balance and occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; can never climb ladders, ropes and scaffolds; can perform frequent bilateral overhead reaching; must avoid concentrated exposure to vibration and moderate exposure to fumes, odors, dust, gasses and poor ventilation; can only have

occasional, superficial contact with supervisors, co-workers and the general public; and can perform work with no strict time or production demands. Dr. Astrike testified that an individual with Bayes's vocational background and the limitations set forth in the residual functional capacity finding could not perform Bayes's past work but could perform the following jobs: packager (50,000 national jobs, 2,000 Ohio jobs, 50 local jobs); sorter (2,000 national jobs, 50 local jobs); and inspector (100,000 national jobs, 8,000 Ohio jobs, 75 local jobs).

### D. The ALJ decision

In his October 2014 decision denying Bayes's claim, the ALJ went through the five-step sequential evaluation process for determining whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520 and 416.920. The ALJ found that Bayes (1) had not engaged in substantial gainful activity; (2) had a medically "severe" combination of impairments stemming from degenerative disc disease of the cervical spine, chronic obstructive pulmonary disease, depression, and anxiety; and (3) had a combination of impairments that did not equal a listing according to the criteria in 20 CFR Part 404, Subpart P, Appendix 1.

At step four, the ALJ found that Bayes had the residual functional capacity (RFC) to perform various activities but did not have the RFC to perform his past relevant work. The ALJ explained that on the alleged onset date, Bayes reported "worsening . . . of daily living and physical functioning, but relative stability in his social relationships, mood, and sleep patterns." (R. 11, PID 114.) The ALJ noted that at subsequent doctors' appointments, Bayes's depression had "improved" and was being "controlled" (*id.* at PID 115), but Bayes also showed "compliance issues" by not taking medications as prescribed to save money (*id.* at PID 116). The ALJ stated that Bayes described daily activities "that are not as limited to the extent one would expect given the complaints of disabling symptoms and limitations," including watching television, talking on

the phone, visiting family, cooking, shopping, working on his vehicles, driving, and caring for a young child at home. (*Id.* at PID 118.) The ALJ determined that Bayes's description of symptoms and limitations was "inconsistent, unpersuasive, exaggerated, and not supported with objective findings." (*Id.*) The ALJ stated that Bayes responded well to treatment and medication, even though he did not always follow doctors' recommendations. The ALJ found that although the objective medical evidence supported a finding that Bayes had some limitations, it did not "support limitations to the extent that [Bayes] has alleged in conjunction with the application." (*Id.* at PID 120.)

At step five, the ALJ determined that Bayes was not disabled prior to May 13, 2014 because jobs existed in the national economy that Bayes could have performed. The ALJ explained that Bayes was "capable of making a successful adjustment to other work that existed in significant numbers in the national economy," specifically, the light exertional jobs that the vocational expert identified. (*Id.* at PID 124.) The ALJ did, however, find that Bayes became disabled on May 13, 2014, when he turned fifty years old, because his age category changed and there were limited available jobs in the national economy that he could perform.

### E. Appeals Council

Bayes requested review of the ALJ's decision by the Appeals Council, arguing that the ALJ erred in finding that Bayes was not disabled prior to May 13, 2014. The Appeals Council responded with a letter stating that it had granted the request for review and intended to issue a decision that Bayes was not disabled at any time. The Appeals Council invited Bayes to submit additional evidence before it rendered a final decision. In response, Bayes's counsel sought to withdraw Bayes's request for review. Two months later, the Appeals Council adopted the ALJ's decision that Bayes was not disabled prior to May 13, 2014, and issued a new ruling that Bayes

was not disabled after this date because there were jobs in the national economy that Bayes could perform. This was the final administrative decision.

Bayes then filed this action seeking review of the Commissioner of Social Security's (Commissioner) decision. After a magistrate judge issued a report and recommendation (R&R) recommending that the district court affirm the Commissioner's decision, the district court adopted the R&R in full and affirmed the Commissioner's decision. Bayes now appeals.

## II. DISCUSSION

### A. Standard of Review

Bayes seeks to reverse the Commissioner's finding that he was not disabled. Pursuant to 42 U.S.C. § 405(g), we have jurisdiction to review the Commissioner's decisions. Our review "is limited to determining whether the Commissioner's decision 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Even if supported by substantial evidence, however, "'a decision of the Commissioner will not be upheld where the [Commission] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## B. Bayes's Argument

Bayes's argument on appeal is limited. He argues only that the ALJ failed to consider all the medical evidence and render a decision on the record as a whole. Bayes claims that the ALJ neglected to consider Dr. Swimmer's BWC forms entitled "Physician's Reports of Work Ability" dated October 25, 2013 and February 26, 2014 (Physician's Reports), both of which noted that Bayes had a marked limitation in adaptation. (Appellant Br. at 2.)

The record contains four reports by Dr. Swimmer: (1) a psychological evaluation for the Ohio BWC dated October 25, 2013; (2) a BWC Physician's Report of Work Ability also dated October 25, 2013; (3) a BWC Physician's Report of Work Ability dated February 26, 2014; and (4) a "mental impairment questionnaire" dated May 27, 2014.[5]

Bayes argues that although the ALJ considered the October 25, 2013 psychological evaluation and the May 27, 2014 mental impairment questionnaire, the ALJ failed to consider the BWC Physician's Reports, which both found that Bayes's mental-health issues caused temporary total disability and that Bayes had a "marked" limitation in adaptation. (Appellant Br. at 2, 21, 25–26.) Bayes asserts that the ALJ erred by finding that Bayes had only "mild" or "moderate" (i.e., less than "marked") limitations in his mental-health functioning, a determination "the ALJ made a part of his assessed Residual Functional Capacity." (*Id.* at 22.) Observing that "further limitation in the Residual Function Capacity would presumably lead to fewer jobs available to Mr. Bayes," Bayes claims that it is "correspondingly reasonable to conclude that adoption of the

---

[5] The parties disagree as to whether Dr. Swimmer dated the mental impairment questionnaire May 27, 2014 or May 29, 2014. This disagreement does not affect our analysis. We assume, for the sake of argument, that the mental impairment questionnaire was dated May 27, 2014.

'marked limitation' at issue would likely lead to a different result on remand," including a finding of disability. (*Id.* at 22–23.)

### C. The ALJ Adequately Considered Dr. Swimmers' Opinions

Bayes has not shown that the ALJ failed to consider the two BWC reports. The ALJ stated:

> The record contains various opinions relating to the claimant's workers' compensation claim at first for his physical allegations followed later by his mental health allegations. These opinions focused on whether the claimant's alleged conditions were directly related to his work injury in May of 2010, and any reference to disability is based on different disability standards. *While every one of these opinions has been considered*, there is nothing in these opinions supporting a finding of disability prior to the established onset date (See, e.g. Exhibit 38F).

(R. 11, PID 121 (emphasis added).) By referring to "every one" of the workers' compensation opinions, the ALJ presumably included Dr. Swimmer's Physician's Reports from October 25, 2013 and February 26, 2014.

Bayes protests that a "deep dive" into the ALJ's statements contradicts a finding that the ALJ considered the BWC Physician's Reports. (Appellant Br. at 25.) Bayes notes that the ALJ focused on the causal relationship between Bayes's accident and his mental-health impairments, even though the BWC Physician's Reports do not mention causation. However, in stating that Dr. Swimmer's opinions "focused on whether the claimant's alleged conditions were directly related to his work injury," the ALJ simply observed that all Dr. Swimmer's reports were Ohio worker's compensation forms. (R. 11, PID 121.) Although the BWC Physician's Reports did not explicitly mention the causal relationship between the accident and Bayes's mental-health issues, their purpose was to determine his eligibility for workers' compensation based on the auto accident, one component of which is causation.

Another component of a workers' compensation claim is disability, but that term has different meanings depending on the context. The ALJ explicitly referred to Exhibit 38F, which is the report of the October 25, 2013 psychological evaluation on which all Dr. Swimmer's other

reports are apparently based. This evaluation found that Bayes's depression and anxiety caused temporary total disability, which the Ohio workers' compensation statute defines as "a disability which prevents a worker from returning to [the worker's] former position of employment." *State ex rel. Crim v. Ohio Bur. of Workers' Comp.*, 751 N.E.2d 990, 993 (Ohio 2001) (referring to Ohio R.C. § 4123.56). The ALJ concluded that there was "nothing" in the October 25, 2013 examination and report, or in any other opinions, that supported a finding of disability. This conclusion reflects the fact that disability for social-security-disability-benefits purposes is a much higher standard than disability for Ohio workers' compensation purposes.

The ALJ also discussed Dr. Swimmer's May 27, 2014 mental impairment questionnaire and explained why he gave it little weight:

> Little weight is given to the mental impairment questionnaire at Exhibit 45F, dated May 27, 2014, from Dr. Swimmer, indicating six visits. Although marked and extreme limitations in some areas were noted with an onset date of November 15, 2013, these limitations were only supported [] by the comments "Cannot concentrate/severe depression attempted suicide." These limitations are not supported by treatment notes or other evidence in the record. The record reflects minimal treatment as well as improvement with minimal treatment.

(R. 11, PID 121.)

Bayes responds that the ALJ's consideration of the May report does not make up for his failure to consider the Physician's Reports because Dr. Swimmer made findings about Bayes's limitations on the Physician's Reports that were different from those in the May mental impairment questionnaire. Bayes asserts that because the ALJ "never directly addressed the limitations associated with the functional area of 'adaptation'" in the May questionnaire "it cannot be said that he has specifically weighed the marked limitation in the area of adaptation that is contained on the October and February forms." (Reply Br. at 3.)

However, in considering the May 27, 2014 questionnaire, the latest opinion of the four, the ALJ was effectively reviewing the same information as contained in Dr. Swimmer's BWC

Physician's Reports. In the May 2014 questionnaire, Dr. Swimmer checked boxes indicating that Bayes had "marked" limitations in the following "work activities": "Maintain[ing] attention and concentration for extended periods," "Work[ing] in coordination with or proximity to others without being distracted by them," "Get[ting] along with coworkers or peers without exhibiting behavioral extremes," and "Sustain[ing] an ordinary routine without special supervision." (R. 11, PID 846.) These impairments are substantially similar to the "adaptation" criteria addressed in the Physician's Reports—the "ability to appropriately react to stressful circumstances, including the workplace; includes attendance, making decisions, scheduling or completing tasks and interacting with supervisors and co-workers." (*Id.* at PID 811–12.) Thus, assuming for argument's sake that the ALJ did fail to consider the two Physician's Reports, the adaptation limitations noted in those reports are not sufficiently different from those in the May report to believe that they would have caused the ALJ to reach a different conclusion. Any error was therefore harmless. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) (explaining that ALJ's refusal to even acknowledge the opinion of a treating physician was harmless error, because physician provided no objective basis for his conclusions and his opinion was contradicted by the weight of the other evidence).

Bayes also argues that the May form contained "extreme" limitations in certain areas, and it is impossible to know how the ALJ "would have considered the far less restrictive October and February forms." (Reply Br. at 5.) But even if the May mental impairment questionnaire reached "more restrictive" conclusions about Bayes's limitations than the BWC Physician's Reports (*see id.* at 4), there is still considerable overlap between the forms. There is no reason to believe that the ALJ's analysis would have changed had he evaluated each of the boxes checked on the "less restrictive" BWC Physician's Reports. The ALJ took issue with the value of Dr. Swimmer's

opinions as expressed by the checked boxes indicating Bayes's limitations, explaining that these limitations were "not supported by treatment notes or other evidence in the record." (R. 11, PID 121.) *See Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566 (6th Cir. 2016) (stating that many courts agree that "administrative law judges may properly give little weight to a treating physician's 'check-off form' of functional limitations that 'did not cite clinical test results, observations, or other objective findings'") (citation omitted). The ALJ gave sufficient reasons for affording Dr. Swimmer's May 2014 report "little weight," and these reasons ultimately apply to all four reports. The ALJ clearly considered all of Dr. Swimmer's opinions together, even if he did not address each one individually.

Further, the ALJ was not required to explain every piece of evidence in the record and address each check mark from the Physician's Reports. An "ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Loral Defense Sys.–Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999) (explaining that "[a]lthough the ALJ's decision in this case may not be a model of clarity and detail, . . . the ALJ's treatment of the evidence in this case is more than amply supported by the record as a whole"); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").

In sum, the ALJ appears to have considered the two Physician Reports and, assuming that he did not, the ALJ's reasoning shows that any error was harmless.

### III. CONCLUSION

Because substantial evidence in the record supports the Commissioner's determination, the district court's decision is **AFFIRMED**.